**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

| | | |
|---|---|---|
| ABIGAIL MARILYN AYERS, as | : | |
| Surviving Spouse and Administratrix | : | |
| of the Estate of JONATHAN PAUL | : | |
| AYERS, | : | |
| | : | CIVIL ACTION NO. |
| Plaintiff, | : | 2:10-CV-32-RWS |
| | : | |
| v. | : | |
| | : | |
| OFFICER BILLY SHANE | : | |
| HARRISON, *et al.*, | : | |
| Defendants. | : | |

## ORDER

This case comes before the Court on Defendants' Motion for Summary

Judgment [158] and Motion for Hearing on the Matter [208]. After a review of

the record, the Court enters the following order.

## I. Factual Summary

The fact disputes in this case abound. However, taking the facts most

favorable to the Plaintiff, the following occurred:

In July 2009, the Mountain Judicial Circuit Narcotics Criminal Investigation and Suppression Team ("NCIS")[1] began investigating a known crack-cocaine dealer and prostitute, Kayla Baker. Def.'s SMF, Dkt. No. [158-13] at ¶ 1; Pl.'s Resp. SMF, Dkt. No. [167] at ¶ 1. On September 1, 2009, Defendant Chance Oxner, Defendant Billy Harrison, and two other NCIS agents drove to the Relax Inn in Toccoa, Georgia so that Oxner could attempt to purchase crack from Baker, identify her supplier, and make arrests. Id. As undercover agents, Oxner and Harrison were both dressed in street clothes, and Harrison had an NCIS badge on a chain around his neck and had a Glock .40 caliber firearm holstered at his waist–both of which he kept hidden under his T-shirt. Def.'s SMF at ¶ 2; Pl.'s Resp. SMF at ¶ 2. Whether Harrison ever pulled his badge during that day is disputed.

The NCIS team drove near the Relax Inn, let Oxner out, and Oxner proceeded to walk to meet Barrett.  Def.'s SMF at ¶ 3; Pl.'s Resp. SMF at ¶ 3. In her hotel room, Oxner negotiated a $50 buy of crack cocaine but Barrett was short enough crack to cover the buy.  She provided him what she had, but told

---

[1]The NCIS was formed by Rabun, Stephens, and Habersham Counties along with the District Attorney's office in the Spring of 2009 to improve drug investigations within that judicial circuit. Def.'s SMF at ¶ 52; Pl.'s Resp. SMF at ¶ 52.

him he would have to wait for her supplier to bring her more to complete the transaction. Def.'s SMF at ¶¶ 4-5; Pl.'s Resp. SMF at ¶¶ 4-5. It is disputed whether Oxner already knew who her supplier was or if he decided to wait with Barrett to learn–for the first time–the supplier's identity. Def.'s SMF at ¶ 5; Pl.'s Resp. SMF at ¶ 5. Regardless, Oxner agreed to wait with Barrett. Def.'s SMF at ¶ 6; Pl.'s Resp. SMF at ¶ 6.

As they were waiting for the supplier, Barrett suggested that the two walk down Currahee Street to the Exxon station, and the two of them walked there. Id. On the way back to the Inn, a reddish colored Honda came up Carrahee Street, and Barrett yelled "Jay" at the driver. Def.'s SMF at ¶ 7; Pl.'s Resp. SMF at ¶ 7. Barrett then instructed Oxner to return to the hotel, and he did. Id.

Harrison and the other agents continued to watch Barrett and the driver of the Honda, Jonathan Ayers, from afar. Barrett walked up to the vehicle, Ayers gave Barrett money, and Ayers then drove off. At the time, the Defendants did not know why this money had changed hands, Harrison Dep., Dkt. No. [175] at 120:5-21, but they learned sometime after Ayers' death that Ayers gave Barrett twenty dollars. Def.'s SMF at ¶ 8; Pl.'s Resp. SMF at ¶ 8.  Harrison and the rest of the team initially followed Ayers to Broad Street, but because Oxner was still

3

undercover, they were not "going to go after" Ayers. Harrison Dep. at 121:5-11. Rather, they returned to their stake-out position across the street from the Relax Inn. Id. at 121:12-16.

When Barrett returned to the Relax Inn, she told Oxner that she still did not have enough crack and that it would be awhile before her supplier could bring more. Def.'s SMF at ¶ 10; Pl.'s Resp. SMF at ¶ 10. Oxner responded that he needed to get back to work and would return later for the rest of his buy. Id.

Oxner then left the Relax Inn and told Harrison to come and pick him up. Def.'s SMF at ¶ 11; Pl.'s Resp. SMF at ¶ 11. The two then drove together to meet their Commander, Defendant Kyle Bryant, in the Stephens County Courthouse parking lot. Id. After a brief discussion, Oxner and Harrison then got in Bryant's undercover vehicle–a Cadillac Escalade EXT–with the intent to return to the stake-out position to continue the surveillance of Barrett. Def.'s SMF at ¶ 12; Pl.'s Resp. SMF at ¶ 12. As the agents drove by the Relax Inn, the agents saw Barrett sitting outside so they continued past and turned around. Def.'s SMF at ¶ 13; Pl.'s Resp. SMF at ¶ 13.

After turning around, Harrison noticed that Ayers' vehicle happened to be in front of them on Currahee Street. Id. The agents decided to follow him to

ask him questions about the money exchange. Def.'s SMF at ¶ 14; Pl.'s Resp. SMF at ¶ 14. Ayers then pulled into the Shell station at Currahee and Broad Streets and parked on the right side of the station, and the agents pulled into a location across the street to obtain Ayers' tag number. Def.'s SMF at ¶ 15; Pl.'s Resp. SMF at ¶ 15.

After a minute or two, Harrison then decided that the agents should drive over to the Shell station to speak with Ayers. Def.'s SMF at ¶ 17; Pl.'s Resp. SMF at ¶ 17. At the time, though, Harrison did not have probable cause or the right to detain Ayers; Ayers was free to deny his request to speak with him. Harrison Dep. at 137-138.

At the time the agents drove over, Commander Bryant was driving, Oxner was sitting in the front passenger seat, and Harrison was sitting behind Bryant in the rear passenger seat. Def.'s SMF at ¶ 19; Pl.'s Resp. SMF at ¶ 19.

After using the ATM, Ayers then exited the Shell station and proceeded to his vehicle. Once Ayers got in the driver seat, the agents abruptly drove into the Shell parking lot in the unmarked Escalade. Without waiting on the uniformed officer and marked police cruiser which Defendants had called to make the stop, Wise Dep., Dkt. No. [180] at 8:7-19, Harrison quickly exited the

vehicle from the left rear passenger door and immediately pulled his weapon. Video at 14:27:49-50; Motes Depo., Dkt. No. [190] at 50:22-25 ("When I first seen [Harrison], he had a gun. That's what signaled me to call the law, the 911.").[2] Harrison then approached Ayers' passenger side window. Motes Aff., Dkt. No. [190-1] at ¶¶ 5-6; Nicholson Aff., Dkt. No. [197] at 24:17-21.Without identifying himself as a police officer, Harrison either waived his gun at Ayers or tapped his gun on Ayers' right front door window and told Ayers to "get out of the car." Kervin Aff., Dkt. No. [165-6] at ¶ 7; Motes Aff., Dkt. No. [190-1] at ¶¶ 6, 10; Ex. 111 to Oxner Dep., Interview between Mark Roberts and Oxner, Dkt. No. [176] at 11:5-8 (stating that Harrison had his weapon displayed when he first approached Ayers).

---

[2]Defendants try to discount Motes' testimony by trying to prove that his vehicle was not where he said it was; thus, they argue, his vantage point was not credible. But, as everyone concurs, Motes' vehicle was off-video at the time of the incident. Therefore, the video does not explicitly contradict Motes' statement as to where he was located when the shots were fired. Rather, any argument as to where Motes' vehicle was actually located is one for the jury. As well, Defendants note that at one point during his deposition, Motes states that he did not then remember whether Harrison exited the vehicle with a gun drawn. Motes Dep., Dkt. No. [190] at 51:18-21. However, Motes goes on to state that he does not have an "awesome memory" and that whatever he originally stated in his affidavit is true.  Thus, the Court finds Motes affidavit statements and deposition statements based upon personal knowledge to be sufficient to create a genuine issue of material fact.

Ayers thought he was being robbed and began to back up in a circle around the Escalade to avoid the perceived armed robbery. Kervin Aff., Dkt. No. [165-6] at ¶ 7; Motes Aff., Dkt. No. [190-1] at ¶ 5. While Ayers was quickly backing, Defendant Oxner then exited the Escalade to assist Harrison and ran into the path of Ayers' vehicle–putting himself in harm's way. Video at 14:27:48-54. In an attempt to avoid being run over, Oxner then hit the back of Ayers' vehicle with his hand and jumped to the right. Id. at 14:27:48-54. As Oxner was jumping out of the way, Harrison ran toward the reversing vehicle with his gun pointed at Ayers. Id.

At this point, while Ayers' vehicle was continuing to move backward, Oxner was standing by the right quarter panel of the vehicle, Harrison was continuing to run at the vehicle, and Bryant was slowly turning the Escalade around toward the action. Id. at 14:27:53-55. Harrison then fired the first shot which struck the vehicle in the passenger side door. Id. at 14:27:54.919; Fite Dep., Dkt. No. [188] at 22-26. In response, Ayers put the car in drive to try and flee the attack, turning the car's wheels away from Harrison and toward the roadway. Fite Expert Rep., Dkt. No. [188-1] at 5. Harrison shot again as the vehicle was turned away from him. Id. It was this shot that killed Ayers. Id.

However, Ayers' death was not imminent. Ayers left the Shell station and proceeded down Broad Street with Harrison and Oxner initially following on foot. Def.'s SMF at ¶ 37; Pl.'s Resp. SMF at ¶ 37. At the end of the parking lot, Oxner jumped in the Escalade with Defendant Bryant. Def.'s SMF at ¶ 39; Pl.'s Resp. SMF at ¶ 39. However, Bryant and Oxner made a wrong turn and lost pursuit so they did not witness any additional interactions between Ayers and Harrison. Id.

Ayers then crashed his vehicle below the Toccoa Fire Department and got out of the car. Def.'s SMF at ¶ 37; Pl.'s Resp. SMF at ¶ 37. As Harrison approached the vehicle with his gun still in his hand, he screamed "you son-of-a-bitch, you'll learn to stop." Burden Aff., Dkt. No. [165-2] at ¶¶ 9-10. Ayers then got back in the vehicle, and Harrison forcibly pulled him back out and struggled to get Ayers under control. Def.'s SMF at ¶ 37; Pl.'s Resp. SMF at ¶ 37.

EMS was called and while they were prepping Ayers, he kept asking, "am I going to make it?" Stephens Aff., Dkt. No. [165-4] at ¶ 6. Once at the hospital and while he was being prepped for surgery, Ayers told police officers

that he thought he was being robbed. Kervin Aff., Dkt. No. [165-6]. Ayers died shortly thereafter.

At the time of the incident, Harrison had not satisfied his Police Officer Standards and Training ("POST") requirements, and he was hired by Stephens County Sheriff's Office with this deficiency. Wilson Dep., Dkt. No. [184] at 64:11-65:11; Jones Aff., Dkt. No. [165-1] at ¶¶ 5, 10-11. These standards must be met for a police officer to have general law enforcement powers and arrest powers in the State of Georgia. See O.C.G.A. § 35-8-17(a). As well, Harrison did not receive any use of force training from his time of hiring until after the incident. Jones Aff., Dkt. No. [165-1] at ¶ 13.

After the incident, Abigail Marilyn Ayers, as administratrix of Ayers' estate, filed this suit in federal court, asserting claims of: 1) excessive force, 2) failure to intervene to prevent excessive force, 3) failure to train, 4) assault and battery, 5) false arrest, 6) negligent use of a motor vehicle, 7) negligent breach of a ministerial duty, and 8) negligence. Cmpl., Dkt. No. [1]. Plaintiff brought these claims against the three agents who were involved at the scene (Harrison, Bryant, and Oxner) as well as the Sheriff of Stephens County, Randy Shirley, and the Sheriff of Habersham County, Joey Terrell. Stephens and Habersham

Counties' Sheriffs Offices were members of the NCIS Task Force and hired the at-issue agents. As well, the agents were all cross-deputized as deputy Sheriffs in Stephens, Rabun, and Habersham Counties. Def.'s SMF at ¶¶ 50-51, 64-65; Pl.'s Resp. SMF at ¶¶ 50-51, 64-65.

## II. Discussion[3]

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'"  Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations omitted)).  Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and

---

[3]Because the Court finds the briefing sufficient in this matter, Defendants' Motion for Hearing [208] is **DENIED**.

present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

The applicable substantive law identifies which facts are material. Id. at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Id. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002). But, the court is bound only to draw those inferences which are reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met

11

its burden, the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

## B. Federal Claims

Plaintiff brings her first three claims for damages pursuant to 42 U.S.C. § 1983, alleging that Defendants Harrison, Oxner, and Bryant violated Ayers' Fourth Amendment right to be free from unreasonable seizures, and Defendants Shirley and Terrell maintained a policy and/or custom which exhibited deliberate indifference to Ayers' constitutional rights. Section 1983 provides,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983. "In order to prevail in a civil rights action under section 1983, 'a plaintiff must make a prima facie showing of two elements: (1) that the act or omission deprived plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States, and (2) that the act or omission was done by a person acting under color of law.'" Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993) (emphasis

AO 72A
(Rev.8/82)

added) (quoting <u>Bannum, Inc. v. City of Ft. Lauderdale</u>, 901 F.2d 989, 996-97

(11th Cir. 1990)).  In each case, Plaintiff brings her federal claims against the

Defendants in their individual capacities. The Court will consider each claim in

turn.

### 1. Unreasonable Seizure - Bryant, Oxner, and Harrison

As an initial matter, Defendants argue that they had reasonable suspicion

to conduct an investigatory stop of Ayers because he was seen providing $20 to

a known drug-dealer and prostitute in a high-crime area. Because Plaintiff does

not address this argument, and assuming Plaintiff has mounted a claim for an

unconstitutional <u>Terry</u> stop, Defendants' argument is deemed unopposed.[4]  LR

7.1(B), NDGa ("Failure to file a response shall indicate that there is no

---

[4]In her entire discussion of her federal claims, Plaintiff's only statement regarding reasonable suspicion is that "Defendants have admitted in their Answer that there was no probable cause to arrest Ayers . . . and that they had <u>no reasonable articulable suspicion</u> that Rev. Ayers was armed or dangerous when he was initially approached." Pl.'s Opp., Dkt. No. [168] at 46 (emphasis in the original). However, this statement is made in the context of whether Harrison's force was reasonable, and Plaintiff never challenges whether Defendants had a reasonable suspicion that "criminal activity was afoot" when Defendants initially approached Ayers vehicle, only that they had no reason to believe he was armed. Moreover, Plaintiff never cites <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), or its progeny–the standard which governs investigatory stops. Thus, Defendants arguments on this point are deemed unopposed.

opposition to the motion."). Therefore, Defendants' Motion is **GRANTED** as to

Fourth Amendment claim grounded in an improper investigatory stop.

### 2. Excessive Use of Force - Harrison

Defendant Harrison next moves for summary judgment on Plaintiff's

excessive force claim. To determine whether a use of force exceeds

constitutional thresholds, the Supreme Court has stated that the question is one

of reasonableness. Graham v. Conner, 490 U.S. 386, 395 (1989). That inquiry

requires a "careful balancing of the nature and quality of the intrusion on the

individual's Fourth Amendment interests against the countervailing

governmental interests at stake." Id. at 396 (internal quotations omitted). And

while the Supreme Court has recognized that an investigatory stop requires "the

right to use some degree of physical coercion or threat thereof to effect it,"

proper application of the Fourth Amendment requires the district court to turn

its "careful attention to the facts and circumstances of each particular case,

including the severity of the crime at issue, whether the suspect poses an

immediate threat of safety of the officers or others, and whether he is actively

resisting arrest or attempting to evade arrest by flight." Id. Further, this Circuit

14

also considers a "myriad" of other factors outside of the <u>Graham</u> test in

determining reasonableness, including

> "(1) the need for the application of the force, (2) the relationship
> between the need and the amount of force used, (3) the extent of
> the injury inflicted and, (4) whether the force was applied in good
> faith or maliciously and sadistically." <u>Moore v. Gwinnett Cnty.</u>,
> 967 F.2d 1495, 1498 (11th Cir. 1992) (quoting <u>Leslie v. Ingram</u>,
> 786 F.2d 1533, 1536 (11th Cir. 1986)). Furthermore, "[i]n making
> this objective assessment, a court may consider in addition to
> physical injury 'other relevant factors including the possibility that
> the persons subject to the police action are themselves violent or
> dangerous, the duration of the action, whether the action takes
> place in the context of effecting an arrest, the possibility that the
> subject may be armed, and the number of persons with whom the
> police officers must contend at one time.'" <u>Crosby v. Paulk</u>, 187
> F.3d 1339, 1351 (11th Cir. 1999) (quoting <u>Sharrar v. Felsing</u>, 128
> F.3d 810, 822 (3d. Cir. 1997)).

<u>Jackson v. Sauls</u>, 206 F.3d 1156, 1170 n.18 (11th Cir. 2000). More specifically,

in considering a case of deadly force such as this, the Supreme Court and this

Circuit have noted that deadly force is reasonable when an officer "(1) has

probable cause to believe that the suspect poses a threat of serious physical

harm, either to the officer or to the others or that he has committed a crime

involving the infliction or threatened infliction of serious physical harm; (2)

reasonably believes that the use of deadly force was necessary to prevent

escape, **and** (3) has given some warning about the possible use of deadly force,

15

if feasible." <u>Vaughan v. Cox</u>, 343 F.3d 1323, 1329-30 (11th Cir. 2003) (quoting

<u>Tennessee v. Garner</u>, 471 U.S. 1 (1985)) (internal marks omitted).

     In making this finding, the Court is cognizant that the inquiry is an

objective one, viewed from the perspective of an officer on the scene. <u>Pace v.</u>

<u>Capobianco</u>, 283 F.3d 1275, 1281 (11th Cir. 2002). And it must recognize that

"police officers are often forced to make split-second judgments–in

circumstances that are tense, uncertain, and rapidly evolving–about the amount

of force that is necessary in a particular situation." <u>Long v. Slaton</u>, 508 F.3d

576, 580 (11th Cir. 2007) (quoting <u>Graham</u>, 109 S. Ct. 1872). "[T]he question

then is whether, given the circumstances, [Ayers] would have appeared to

reasonable police officers to have been gravely dangerous." <u>Id.</u> at 581. Taking

the facts most favorable to the Plaintiff, that answer must be no.

     At the time Harrison shot and killed Ayers, Harrison had no probable

cause to believe that Ayers had committed a crime. Further, Harrison did not

announce that he was a police officer, was in plain clothes, and came out of an

unmarked Escalade–which had quickly approached–with his gun drawn. In fact,

even though the Defendants called a uniformed officer to the scene, Harrison

did not wait on him and proceeded to confront Ayers anyway.

16

Moreover, Harrison elected to confront Ayers in such a fashion even though he had already obtained his vehicle tag number and could have, instead, followed Ayers until the uniformed officer could catch up, or he could have simply waited to question him at his home.  "[D]efendants cannot claim the protection of qualified immunity when their own objectively unreasonable actions created the very risk that generated the eventual use of deadly force." Swofford v. Eslinger, 671 F. Supp. 2d 1289, 1305 (M.D. Fla. 2009) aff'd 395 Fed. App'x 559 (11th Cir. 2010); see Sledd v. Lindsay, 102 F.3d 282, 288 (7th Cir. 1996) ("where a person has no reason to know that someone is a police officer, and the officer's identity is concealed, the normal rules governing use of deadly force and right to resist are modified . . . . If the police had not impermissibly created the situation in which he felt the need to arm himself and resist people he believed to be intruders, neither the arrest nor the imprisonment would have taken place."). Taking the facts most favorable to the Plaintiff, the Court cannot say as a matter of law that a reasonable officer would have shot Ayers.

This analysis does not change because Ayers was trying to flee the scene in a motor vehicle and almost ran over Oxner. First, the Court cannot say that

17

Oxner did not run behind the clear trajectory of the moving vehicle, putting himself in harms' way. Nor can the Court say based upon the video that Ayers even saw Oxner or would have been able to stop to prevent the encounter. See Estate of Starks v. Enyart, 5 F.3d 230, 234 (7th Cir. 1993) (stating that if the officer stepped in front of the plaintiff's rapidly moving vehicle without allowing him time to brake, the officer would have unreasonably created the situation which ostensibly permitted the use of lethal force). But, from the video, it appears that Harrison could have seen Oxner after Oxner hit Ayers' vehicle and before shots were fired. Thus, self-defense of others would have been improper. Moreover, as Plaintiff's expert noted, Ayers' tires were turned away from Harrison when he fired the second fatal shot; Harrison was not in danger. All of this is exacerbated by the fact that Harrison and Oxner continued to pursue Ayers when he was attempting to flee the scene and was not known to be dangerous.

Harrison's case citations do not change that analysis, either. As the Northern District of Alabama noted in Scheuerman v. City of Huntsville, 499 F. Supp. 2d 1205, 1220 (N.D. Ala. 2007), aff'd 276 Fed. App'x 896 (11th Cir. 2008), "[t]his is not a case where a uniformed officer uses deadly force on a

18

suspected felon after he avoids an investigatory pat-down, flees in a car, and engages in a highspeed reckless chase with multiple police cars in tow, and refuses to get out of his car once it had been blocked on three sides and told by police to exit his vehicle. See Pace v. Capobianco, 283 F.3d 1275 (11th Cir. 2002)." Rather, this is a case of mistaken police identity.

This is case is also dissimilar to Long, 508 F.3d at 578-79. In Long, the plaintiff's father, a medical doctor, called the police to arrest his son due to his son's psychosis. When the uniformed officer arrived, he left his keys in the car while he went to handcuff the son. The son then ran and jumped in the police cruiser, shutting the door. The officer ran to the door, pulled his weapon, and threatened the son, stating that if he did not get out of the vehicle he would be shot. The son then put the vehicle in reverse and began backing. The officer fired three shots, one of which killed the son. The Court does not find that case to be similar to this one in any manner. Long involved a uniformed officer, a clear threat of deadly force, and a plaintiff who was known to be a danger to himself and others–no factors which are present here.

Nor is this like the Eleventh Circuit's recent decision in Terrell v. Smith, — F.3d —, 2012 WL 255327, *1 (11th Cir. Jan. 30, 2012). In Terrell, two

AO 72A
(Rev.8/82)

undercover plain-clothed officers saw the plaintiff's vehicle driving without headlights and began to follow it. The plaintiff then stopped his vehicle to smoke crack cocaine. The undercover officers then called two uniformed officers in a marked vehicle to pull over the plaintiff's car, and they made the stop. The uniformed officers ordered the plaintiff out of the vehicle and onto his knees outside the car. The plaintiff first acted like he was going to assent, but then jumped back into the vehicle. One of the officers was able to place himself in the open doorway of the plaintiff's car while the plaintiff attempted to make a U-turn, running alongside the vehicle. The officer repeatedly warned plaintiff to stop the vehicle while the officer continued to be struck by the door, but the plaintiff did not. The officer then shot the plaintiff.

Unlike in this case, there the officers had probable cause to believe that the plaintiff had committed a crime as he was driving without headlights in violation of Florida law, and they had evidence that he had just smoked crack cocaine. As well, the plaintiff there was pulled over by uniformed officers. Notably, unlike here, the undercover officers in Terrell chose to follow the plaintiff's vehicle until the uniformed officers could arrive. As well, all parties agreed in that case that the officer made repeated warnings that the plaintiff

would be shot unless he stopped the vehicle. The court simply does not find that case persuasive. As a result, due to factual disputes, the Court cannot find as a matter of law that a reasonable officer would have shot Ayers.

### a. Qualified Immunity

Defendant Harrison next argues that even if he committed a constitutional violation, he is entitled to qualified immunity on that claim. Qualified immunity protects government officials performing discretionary functions from being sued in their individual capacities. Wilson v. Layne, 526 U.S. 603, 609 (1999).  Public officials are shielded under qualified immunity so far as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity is a question of law for the court.  Post v. City of Ft. Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1993).

The Eleventh Circuit utilizes a two-part analysis for the defense of qualified immunity.  First, the defendant official must prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts

occurred.  Hartsfield v. Lemacks, 50 F.3d 950, 953 (11th Cir. 1995).  If the

defendant meets this burden, the plaintiff must then demonstrate that the

defendant violated clearly established law based upon objective standards.  Id.


## 1. Discretionary Act

Plaintiff argues that because Harrison had not completed his required

training pursuant to O.C.G.A. § 35-8-21(a), Harrison lost his corresponding law

enforcement powers. See O.C.G.A. § 35-8-17(a) ("Any peace officer so

employed who does not comply with this chapter shall not be authorized to

exercise the powers of a law enforcement officer generally and particularly

shall not be authorized to exercise the power of arrest."). As he did not have

those law enforcement powers, Plaintiff argues that Harrison could not have

committed a discretionary act which would entitle him to immunity as Georgia

law recognizes that an officer who is not in compliance with Chapter 35-8 "is

thereby relegated to the status of a private citizen." Holstein v. State, 359 S.E.2d

360, 361 (Ga. Ct. App. 1987). However, the fact that any arrest Harrison would

have made or any arrest warrant he would have sworn out would have been

invalid does not affect his right to qualified immunity.

22

A government official acts within his discretionary authority if he was "(a) performing a job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004). Under the first prong, the Court is instructed to consider the defendant's action "at the minimum level of generality necessary to remove the constitutional taint." Id. at 1266. Here, the question is whether Harrison had the power to complete investigatory stops as a part of his "legitimate job description." Id. The Court holds that he did have such a power.

Next, the Court is instructed to determine whether Harrison pursued that job-related goal in an authorized manner. While the per se phrasing of this prong might lead one to believe that Harrison could not have completed a discretionary act–because he was not "authorized" under state law to have general law enforcement powers–the Court finds that, when looking at dicta which elaborates on this standard, the Eleventh Circuit would find Harrison completed a discretionary act when he killed Ayers. When the Circuit has discussed this prong, it has stated that the ultimate goal is to consider the purpose of qualified immunity; that is, "to allow government employees to

23

enjoy a degree of protection only when exercising powers that legitimately form a part of their jobs." Id. at 1267. The Circuit has looked to determine whether the officer was acting "entirely on his own behalf." Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1281 (11th Cir. 1998). Here, while Harrison's POST requirements were not satisfied, the Court does not find that he was acting entirely on his own behalf. This was not a frolic or a situation where Harrison took on duties which are not lawfully given to police officers.

As well, the Court notes that Holstein, the Georgia state case which establishes that officers who do not satisfy Chapter 35-8 are relegated to the status of private citizens, occurred in the context of whether an arrest warrant sworn by an uncertified police officer was invalid. The Georgia Court of Appeals held repeatedly that it was the officer's lack of certification which was problematic to the warrant. But, here, Harrison's training deficiency in no way affected his police officer certification. See O.C.G.A. § 35-8-7.1 (stating the grounds for revoking certification and not including a training deficiency as such a ground). But even if the certification/training distinction would not matter for the Court of Appeals' purposes, that case was still in the context of a warrant's invalidity, not whether federal qualified immunity would attach to

that officer's actions. Because the Court finds that Harrison was not acting on his own behalf and was completing job-related functions, Harrison has met his burden that he was completing a discretionary act.

### 2. Clearly Established Right

Because Harrison has met his burden that he was acting within his discretionary authority, the burden then shifts to the Plaintiff to show that Harrison violated a clearly established constitutional right.

> The plaintiffs can demonstrate that the contours of the right were clearly established in several ways. First, the plaintiffs may show that "a materially similar case has already been decided." Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir.2005) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed.2d 396 (1982)). Second, the plaintiffs can point to a "broader, clearly established principle [that] should control the novel facts [of the] situation." Id. (citing Hope, 536 U.S. at 741, 122 S. Ct. 2508). Finally, the conduct involved in the case may "so obviously violate[ ] th[e] constitution that prior case law is unnecessary." Id. (citing Lee v. Ferraro, 284 F.3d 1188, 1199 (11th Cir. 2002)). Under controlling law, the plaintiffs must carry their burden by looking to the law as interpreted at the time by the United States Supreme Court, the Eleventh Circuit, or the [Georgia] Supreme Court. See id.

Terrell, 2012 WL 255327, at * 9.

Plaintiff relies on the seminal decision <u>Tennessee v. Garner</u>, 471 U.S. 1 (1985) to establish that Ayers' constitutional rights were knowingly violated. In <u>Garner</u>, the Supreme Court held:

> The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect. A police officer may not seize an unarmed, nondangerous suspect by shooting him dead. The Tennessee statute is unconstitutional insofar as it authorizes the use of deadly force against such fleeing suspects.

<u>Id.</u> at 11. Taking the facts most favorable to the Plaintiff, the Court cannot say that Harrison's actions did not violate Ayers' clearly established right. Harrison did not have probable cause that Plaintiff had committed a crime, did not warn Ayers that he was an officer, and came out with his gun drawn, telling Ayers to get out of his vehicle as if he were an armed robber. Ayers was clearly trying to flee the scene, and when Harrison finally caught up to him, Harrison stated "you son-of-a-bitch, you'll learn to stop"–circumstantial evidence that Harrison shot him to prevent escape. While other facts may be proven at trial, Harrison's actions in shooting a non-dangerous citizen to prevent escape is not

26

constitutionally sanctioned. Therefore, Harrison's Motion is **DENIED** as to the excessive force claim.

### 3. Failure to Prevent Excessive Use of Force - Bryant and Oxner

While the Court finds that Harrison's use of force was unreasonable, the Court does not find that Oxner or Bryant could have prevented that unreasonable use of force. Generally, "[a] police officer has a duty to intervene when another officer uses excessive force." Post, 7 F.3d at 1560. But, an officer will only be held liable when he has 1) reason to expect that excessive force will be used, and 2) a reasonable opportunity to protect the plaintiff. See Riley v. Newton, 94 F.3d 632, 635 (11th Cir. 1996) ("When he saw Newton struggling with Lowe, Glisson observed no use of excessive force which might have given rise to a duty to intervene to stop it, nor did he have an indication of the prospective use of excessive force-none occurred until Newton's weapon fired. Because Glisson had no reason to expect the use of excessive force until after it had occurred, he had no reasonable opportunity to protect Lowe, and the obligation to take steps to protect him never arose."). Here, the Court does not

27

find that either Oxner or Bryant knew Harrison would use deadly force, and even if they did, they did not have an opportunity to protect Ayers.

Throughout the entire encounter, Oxner was running around Ayers' vehicle and trying not to get hit, and Bryant was driving the Escalade. The event only lasted approximately 13 seconds and there was never a "stand off," or any other pause in the encounter, which would have alerted Bryant and Oxner to Harrison's intentions. As Bryant testified, he did not see the shots fired and had no idea why Harrison had fired his weapon. Pl.'s Resp. SMF at ¶¶ 40-41. And Oxner was not armed and was never close enough to strip Harrison of his weapon. Instead, he was running around a quickly-reversing vehicle. In sum, even taking Plaintiff's version of the facts as true, Bryant and Oxner did not have an opportunity to stop Harrison and would have had no idea that he would use lethal force until the shots were fired. Defendants' Motion for Summary Judgment is **GRANTED** as to Bryant and Oxner's failure to intervene claims.

### 4. Supervisor Liability for the Excessive Use of Force - Bryant

Bryant also moves for summary judgment on Plaintiff's claim that Bryant violated Ayers' Fourth Amendment rights through his improper on-site supervision of Harrison. Because Plaintiff does not cite the supervisor liability

standard as to Bryant or make any distinct arguments thereto, Bryant's

argument is deemed unopposed and Bryant is entitled to summary judgment on

that claim. LR 7.1(B), NDGa ("Failure to file a response shall indicate that there

is no opposition to the motion.").

### 5. Failure to Train - Shirley and Terrell

Defendants Shirley and Terrell also move for summary judgment on

Plaintiff's supervisor liability claims predicated on their failure to train agents

Harrison, Oxner, and Bryant. "It is well established in [the Eleventh] Circuit

that supervisory officials are not liable under § 1983 for the unconstitutional

acts of their subordinates on the basis of *respondeat superior* or vicarious

liability." Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999) (internal

quotation marks and citation omitted).

> Instead, supervisory liability under § 1983 occurs either when the
> supervisor personally participates in the alleged unconstitutional
> conduct or when there is a causal connection between the actions
> of a supervising official and the alleged constitutional deprivation.
> The necessary causal connection can be established when a history
> of widespread abuse puts the responsible supervisor on notice of
> the need to correct the alleged deprivation, and he fails to do so.
> Alternatively, the causal connection may be established when a
> supervisor's custom or policy results in deliberate indifference to
> constitutional rights or when facts support an inference that the
> supervisor directed the subordinates to act unlawfully or knew that
> the subordinates would act unlawfully and failed to stop them from

AO 72A
(Rev.8/82)

doing so.  The standard by which a supervisor is held liable in his individual capacity for the actions of a subordinate is extremely rigorous.

Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003) (internal quotation marks and citation omitted).

Plaintiff argues that "by failing to train Harrison on the proper use of force and by providing him with a weapon with no background check of his qualifications (which would have revealed he could not legally act as a peace officer), [Shirley and Terrell] have demonstrated that they were deliberately indifferent to their officer's use of deadly force." Pl.'s Opp., Dkt. No. [168] at 69. She also argues that their indifference was shown by failing to conduct an internal investigation into the event even though the Stephens County use of force policy required it, and through evidence that Lt. Wilson attempted to cover up their training deficiencies. Id.

As an initial matter, Defendants do not contest Plaintiff's argument that because Harrison, Bryant, and Oxner were cross-deputized, both Shirley and Terrell were responsible for training all of them, regardless of who hired them. See id. at 26-29, 71. Thus, if the Court finds that Harrison, Bryant, or Oxner

were not sufficiently trained, both Shirley and Terrell will be liable for that failure.

"Failure to train can amount to deliberate indifference when the need for more or different training is obvious . . .and when the failure to train is likely to result in the violation of a constitutional right." Belcher v. City of Foley, 30 F.3d 1390, 1398-99 (11th Cir. 1994). The Supreme Court has stated that "the need to train officers in the constitutional limitations on the use of deadly force, see Tennessee v. Garner, 471 U.S. 1 (1985), can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." City of Canton v. Harris, 489 U.S. 378, 390 n.10 (1989).[5]

Here, Bryant testified that it was Stephens County's responsibility to train Harrison, Dkt. No. [158-3] at ¶ 6, and Shirley testified that Stephens County policies and procedures did not apply to Harrison–rather, the policies of NCIS did. Shirley Dep., Dkt. No. [172] at 101:16-103:2. But, taking the facts most favorable to the Plaintiff, NCIS did not have any policies and procedures

---

[5] As the Defendants note in their brief, much of the language in supervisor liability cases is borrowed from the municipal liability context. Def.'s Br., Dkt. No. [158-12] at 17 n.5; see Belcher, 30 F.3d 1397-98 (using municipal liability cases as persuasive authority in a supervisor liability case). Thus, the Court finds municipal liability cases persuasive even though it recognizes this is a supervisor liability matter.

AO 72A
(Rev.8/82)

prior to the shooting, much less a use of force policy. Def.'s SMF at ¶ 70; Pl.'s Resp. SMF at ¶ 70. Therefore, because Shirley stated that the Stephens County use of force policy did not apply to Harrison, a use of force policy did not exist for Harrison at the time of the incident, and it is undisputed that Harrison was never trained on the use of force following his hiring and prior to the shooting.

This failure is exacerbated by the fact that Harrison was hired with a known training deficiency, specifically one on the use of force. Lt. Wilson of Stephens County ran Harrison's POST report and gave that report, which showed the deficiency, to Shirley, stating "he'll need a waiver for 2008"–meaning that he was deficient. Wilson Dep., Dkt. No. [184] at 64:11-65:11. Further, following an audit in February 2009, Stephens County was made aware that 11 of its officers did not meet their POST training requirements which included a use of force component. See Lewandowski Aff., Dkt. No. [165-11]. While it is disputed whether Shirley was ever told about this document directly, Def.'s SMF at ¶ 83, it was still Shirley's responsibility to ensure that his officers were trained on the use of force for constitutional purposes. Thus, because adequate training on the use of force is an obvious requirement, and Defendants provided no such training, Defendants' violation

is clearly established and they are not entitled to qualified immunity.

Defendants' Motion is **DENIED** as to Plaintiff's failure to train on the use of force claim.

However, the Court does not find that Defendants' failure to train Harrison on how to use his Glock .40 is causally related to Ayers' constitutional deprivation. Plaintiff has not produced any evidence that the gun misfired, or the incident occurred because Harrison did not know how to use the gun. Rather, the event occurred precisely because Harrison fired his gun correctly. Therefore, Defendants' motion is **GRANTED** as to Plaintiff's failure to train on the Glock .40 claim. See Jackson v. Sauls, 206 F.3d 1156, 1168 (11th Cir. 2000) (requiring plaintiff to prove causation in constitutional torts).

### C. State Law Claims

#### 1. Official Capacity Claims against Shirley, Terrell, Harrison, and Bryant

The Defendants have asserted that sovereign immunity bars any state law claims against them in their official capacities. Under the Constitution of the State of Georgia, "sovereign immunity extends to the state and all of its departments and agencies," and "can only be waived by an Act of the General

33

Assembly which specifically provides that sovereign immunity is thereby waived and the extent of the waiver."  GA. CONST. art. I, § 2, ¶ 9(e).  The Georgia Supreme Court has held that "departments and agencies" of the State include counties, which are thus entitled to sovereign immunity from suit in accordance with this constitutional provision.  Gilbert v. Richardson, 452 S.E.2d 476, 479 (Ga. 1994).  "Sovereign immunity is not an affirmative defense . . . that must be established by the party seeking its protection.  Instead, immunity from suit is a privilege that is subject to waiver by the State, and the waiver must be established by the party seeking to benefit from the waiver."  Forsyth Cnty. v. Greer, et al., 439 S.E.2d 679, 681 (Ga. Ct. App. 1993).  Plaintiff argues that the counties' immunities have been abrogated by the General Assembly pursuant to O.C.G.A. § 33-24-51.

O.C.G.A. § 33-24-51 authorizes counties to purchase automobile-liability insurance to cover incidents arising out of the "operation or use of any [insured] motor vehicle" and waives their sovereign immunity "to the extent of the amount of insurance so purchased."  In determining whether a "use" has occurred, courts are to determine whether "the injury 'originated from,' 'had its origin in,' 'grew out of,' or 'flowed from' the use of the motor vehicle *as a vehicle*."  Gish v.

Thomas, 691 S.E.2d 900, 906 (Ga. Ct. App. 2010) (quoting Saylor v. Troup

Cnty., 484 S.E.2d 298, 299 (Ga. Ct. App. 1997) (emphasis in the original)).

Further, Plaintiffs must prove that this vehicle misuse was both the cause-in-fact

and proximate cause of the Plaintiffs' injuries. Lincoln Cnty. v. Edmond, 501

S.E.2d 38, 40 (Ga. Ct. App. 1998).   And, the immunity is only waived if the

insurance policy would provide coverage for the incident. Hicks v. Walker Cnty.

Sch. Dist., 323 S.E.2d 231, 233 (Ga. Ct. App. 1984) (citing Cobb Cnty. v. Hunt,

304 S.E.2d 403 (1983)).  Importantly, though, the Georgia Court of Appeals has

stated that in determining whether a "use" has occurred under the statute, and

thus a waiver of immunity has occurred, courts are to strictly construe the

provision against a finding of waiver. Gish, 691 S.E.2d at 906.

　　　Here, Plaintiff argues that because the Escalade did not have blue lights or

other official insignia, and the shooting only occurred because Ayers did not

know the Defendants were police officers, the Defendants' "use" of the motor

vehicle caused the incident. Pl.'s Opp., Dkt. No. [168] at 80-82. However, that

"use" is too attenuated to waive sovereign immunity. The Defendants did not use

the Escalade as a battering ram nor was this incident caused by Defendants use

of the Escalade *as a vehicle*. Rather, the Escalade was simply the mode of

35

transportation the Defendants used to get to the Shell station. Moreover, under the expressed terms of the policy, the Court does not believe that the insurance company would be willing to cover Ayers' death as a "use" of the vehicle as his death resulted from a gunshot wound, not a car accident. See Policies, Section IV, III A pp. 64-65. The Escalade was not the cause-in-fact of Ayers' injuries. In sum, Defendants' Motion is **GRANTED** as to all official capacity state-law claims.

### 2. Individual Capacity Claims

The Defendants additionally raise official immunity for all state law claims against them in their individual capacities. The state constitutional provision governing official immunity provides as follows:

> [A]ll officers or employees of the state or its departments and agencies may be subject to suit and may be liable for injuries and damages caused by the negligent performance of, or negligent failure to perform, their ministerial functions and may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions. Except as provided in this subparagraph, officers and employees of the state or its departments and agencies shall not be subject to suit or liability, and no judgment shall be entered against them, for the performance or nonperformance of their official functions.

GA. CONST. art. I, § 2, ¶ 9(d).  The Supreme Court of Georgia has held that the term "official functions" refers to "any act performed within the officer's or

36

employee's scope of authority, including both ministerial and discretionary acts." Gilbert, 452 S.E.2d at 483.While the Plaintiff argues otherwise, the Court finds that all of the Defendants' actions in this matter were within the scope of their authorities as police officers. Plaintiff has cited no authority for the proposition that when an officer has not satisfied his POST training requirements, all of his actions, even actions taken in a law enforcement capacity, are not entitled to official immunity. Thus, the threshold question will be whether the acts are ministerial or discretionary.

Whether an act is ministerial or discretionary depends on the nature of the act and not the actor's position. Daley v. Clark, 638 S.E.2d 376, 380 (Ga. Ct. App. 2006). "A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty." Id. By contrast, a discretionary act is one that "calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." Id.

As well, under this definition, the constitutional provision "provides no immunity for ministerial acts negligently performed or for ministerial or

discretionary acts performed with malice or an intent to injure." <u>Gilbert</u>, 452

S.E.2d at 483.  "It however, does provide immunity for the negligent

performance of discretionary acts . . . ." <u>Id.</u>  In sum, under Georgia law, "a

public officer or employee may be personally liable only for ministerial acts

negligently performed or discretionary acts performed with malice or intent to

injure." <u>Harvey v. Nichols</u>, 581 S.E.2d 272, 276 (Ga. Ct. App. 2003).

For purposes of official immunity, "'actual malice' requires a deliberate

intention to do wrong, and denotes express malice or malice in fact.  It does not

include willful, wanton or reckless conduct or implied malice.  Thus, actual

malice does not include conduct exhibiting a reckless disregard for human life."

<u>Daley</u>, 638 S.E.2d at 386.  Further, an "actual intent to cause injury [means] an

actual intent to cause harm to the plaintiff, not merely an intent to do the act

purportedly resulting in the claimed injury." <u>Tabb v. Veazey</u>, 2007 WL 951763,

* 12 (N.D. Ga. 2007) (quoting <u>Kidd v. Coates</u>, 271 Ga. 33, 33 (1999)) (internal

quotations omitted) (applying Georgia law).

### A. Assault and Battery - Harrison, Oxner, and Bryant

As an initial matter, the Court finds that the Defendants' conduct in

conducting a stop and deciding when to use force was discretionary which

requires the Plaintiff to provide evidence of actual malice or intent to cause injury to defeat official immunity. <u>See</u> <u>Tittle v. Corso</u>, 569 S.E.2d 873, 876 (Ga. Ct. App. 2002) (finding that defendant's use of force decision was a discretionary one). The Court finds that there is a triable issue of fact as to whether Harrison acted with an intent to injure the Plaintiff such that assault and battery would be actionable. Plaintiff has presented evidence that Harrison was not in danger and could see that Oxner had not been hit by the vehicle. Plaintiff also has presented circumstantial evidence that Harrison purposely shot Ayers to keep him from fleeing the scene, i.e. Harrison shot Ayers as a punitive measure. Thus, the Defendants' Motion is **DENIED** as to any assault and battery claim against Harrison.

But, the Court does not find that Plaintiff has presented any competent evidence that Oxner or Bryant acted with actual malice or intent to injure. As stated <u>supra</u>, these Defendants did not have an opportunity to intervene in the shooting, and there is no evidence that they affirmed or promoted Harrison's decision to shoot or otherwise assault Ayers. Thus, Defendants' Motion is **GRANTED** as to the assault and battery claims against Oxner and Bryant.

## B. False Arrest - Harrison, Oxner, and Bryant

The Court likewise finds that the decision to arrest was a discretionary one. <u>Reed v. DeKalb Cnty.</u>, 589 S.E.2d 584, 587 (Ga. Ct. App. 2003) ("the decision to effectuate a warrantless arrest generally is a discretionary act requiring personal judgment and deliberation on the part of the officer."). Taking the facts most favorable to the Plaintiff, the Court again finds that there is a triable issue of fact on intent to injure as to Harrison but not as to Oxner and Bryant. Plaintiff has produced evidence that Harrison intended to seize Ayers for the purpose of keeping him from fleeing even though Harrison has conceded he did not have probable cause for arrest. Further, Plaintiff has produced evidence that Defendant intended to harm Ayers in order to effectuate that seizure. But, Plaintiff has produced no evidence that Bryant and Oxner had actual malice or acted with the intent to injure Ayers. Thus, Defendants' Motion is **DENIED** as to false arrest by Harrison but **GRANTED** as to false arrest by Oxner and Bryant.

## C. Negligent Breach of a Ministerial Duty and Negligence - Shirley and Harrison

Defendants finally move for summary judgment on Plaintiff's negligence-based claims. These claims are grounded in the Defendants' failure to abide by

AO 72A
(Rev.8/82)

the POST Act (O.C.G.A. § 35-8-1 *et seq.*) training requirements, and Plaintiff's assertion that these failures are ministerial ones which warrant only a negligence standard for official-immunity purposes. However, the Georgia Court of Appeals has found that in enacting the POST Act and by choosing the remedies it did, the General Assembly did not allow for a private cause of action for POST Act violations, regardless of any additional official immunity protections. See Govea v. City of Norcross, 608 S.E.2d 677, 683 (Ga. Ct. App. 2005) ("The POST Act expressly authorizes civil actions, but only by the POST Council, only for injunctive relief, and only under certain circumstances not alleged here. The General Assembly could have created a cause of action in favor of private individuals injured for a unit's noncompliance with the POST Act reporting requirements. But it did not. Govea and Gomez have pointed to nothing in the POST statutory scheme that shows any legislative intent for such noncompliance to create a civil cause of action for damages by an alleged victim of the violation."). As Plaintiff has not pointed to any provision within the POST statutory scheme which allows for a private right of action for violating training requirements, Defendants' Motion is **GRANTED** as to all negligence-based claims.

41

### III. Spoliation

Plaintiff additionally argues in her brief that because Stephens County Lt. Wilson falsified training records, Officers Wise and Meyers lost notes or did not include all relevant information in their reports, and GBI agent M.T. Ayers' interview with Harrison was tampered with, adverse inferences should be drawn against the Defendants. However, because at summary judgment the Court construes all evidence in the Plaintiff's favor and has found evidence which would otherwise support the inferences Plaintiff could receive based on the documents and statements which are said to no longer exist (i.e., that Harrison intended to harm the Plaintiff, approached without identifying himself, etc.), the Court declines to decide whether this conduct amounted to spoliation or what the appropriate remedy would be. But, should she later elect, Plaintiff may file a motion prior to trial to make a request for curative action to be taken at the trial of the case.

### IV. Conclusion

Based on the foregoing, Defendants' Motion for Summary Judgment [158] is **GRANTED, in part** and **DENIED, in part** and Defendants' Motion for Hearing [208]is **DENIED**. The following claims remain:

AO 72A
(Rev.8/82)

-§ 1983 excessive force claim against Harrison
-§ 1983 failure to train claim against Shirley and Terrell
-Assault and battery against Harrison
-False arrest against Harrison

Summary judgment is granted in favor of Defendants as to all other claims.

**SO ORDERED**, this  17th  day of February, 2012.


**RICHARD W. STORY**
**United States District Judge**

43